### THERAPEUTIC COMMUNITY RESIDENCE, Relator,

### v.

### MINNESOTA DEPARTMENT OF HEALTH, Respondent.

### No. CX–83–1266.

Court of Appeals of Minnesota.

June 19, 1984.

Charles C. Jensch, St. Paul, for relator.

Hubert H. Humphrey, III, Atty. Gen., Richard A. Wexler, Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPOVICH, C.J., and FORSBERG and RANDALL, JJ.

### OPINION

FORSBERG, Judge.

Petitioner is appealing from a decision of a hearing examiner from the State Office of Administrative Hearings which affirmed a decision by the Commissioner of Health denying the petitioner's request for a Certificate of Need under Minn.Stat. § 145.832 *et seq.* We reverse.

### FACTS

On February 23, 1982, Therapeutic Community Residence (TCR) filed a notice of intent and an application for development of a Class A ICF/MR eight bed facility for the mentally retarded in Shafer, Minnesota.[1] TCR would not be a traditional facility

---

1. A Class A facility is one which requires patients who are ambulatory and mobile, and "ca-

pable of taking appropriate action for self-pres-

for the mentally retarded, but would be one which would treat residents who are mentally ill as well as retarded. Thus, TCR would have mental health professionals on its staff and intensive in-patient treatment of the facility's proposed residents. TCR, therefore, purports to be "unique" in that it seeks to treat mentally retarded persons who also have behavioral problems that keep them from being placed in more traditional Class A ICF/MR facilities.

On February 25, 1982, TCR filed its application for a Certificate of Need with the Central Minnesota Health System Agency (CMHSA). Attached to the application were letters of support from the Cambridge State Hospital, Chisago County Welfare Department, Mille Lacs County Family Service and Welfare Department, Kanabec County Social Services, Pine County Department of Human Services and the Isanti County Family Services and Welfare Department. Ultimately, CMHSA recommended to the Department of Health that TCR's application be approved. Also, TCR submitted a cost report to the Department of Public Welfare on the proposed facility. DPW approved a welfare per diem rate of $76.48.

On July 1, 1982, the Department of Health remanded the project back to CMHSA for further review. It required that the following issues be more fully addressed and that findings of fact and conclusions be made relative to those issues:

1. Cost of the facilities (higher than other facilities).
2. Uniqueness of the facility.
3. How the cost of the professional staff (9.00/day) was determined.
4. Need for various professional staff.
5. Source of funding for the after-care program.

The CMHSA reviewed these issues on remand, and on September 3, 1982, after a second public hearing, CMHSA made appropriate findings and again recommended

ervation under emergency conditions." 7

that the Department of Health approve TCR's application for a Certificate of Need.

On November 8, 1982, the Commissioner of Health approved TCR's application for a Certificate of Need, provided the per diem rate set by the Department of Welfare would be reduced to $60.00. TCR sought reconsideration of the Commissioner's decision which was denied on January 3, 1983. The Commissioner's grounds for denial were:

1. The approved interim per diem of $76.43 was significantly higher than the average for similar facilities in the area.
2. There was no documentation in the record from which to conclude that the proposed project with the professional mental illness staffing component would be successful in moving residents to more traditional and less expensive facilities in the 18–24 month projected time frame.
3. There was no documentation in the record that the state hospitals do not have the capability to meet the identified need of the target population or that they would not be acceptable alternatives to the proposed facility.

The hearing examiner affirmed the Commissioner's decision.

## ISSUE

Were the findings of the hearing examiner affirming the denial by the Commissioner of Health of a Certificate of Need for TCR's project unsupported by substantial evidence based on the entire record?

## ANALYSIS

### I.

The first ground cited by the Commissioner of Health for denying the certificate was that the TCR rates were significantly higher than the average rates for similar facilities. Appellant has argued that the Commissioner of Health in citing the projected per diem rate as a basis for deni-

MCAR Sec. 1.392C.I.

al is engaged in rate making which is not its function.

■ The "purpose" section of the Minnesota Certificate of Need Act includes a reference to the necessity for providing the "highest quality of health care at the *lowest possible cost.*" *See* Minn.Stat. § 145.-832 subd. 1. (Emphasis supplied.) Therefore, rates may be considered by the Commissioner of Health in approving a certificate. However, the per diem rate approved by the Welfare Department should be given considerable weight in determining a reasonable cost. In this case, it was accorded no weight.

■ The Commissioner of Health cites an average rate of $47.77 for facilities "in the area" as compared to the TCR rate of $76.43, as evidence of the "significantly higher rate." This average rate was obtained by averaging the rates for *all* ICF/MR facilities in the area. (Those rates were provided by the project review committee of CMHSA.) However, there is no evidence indicating whether all of those facilities accept mentally retarded people with accompanying behavioral disorders. Moreover, those facilities service a variety of patients, ranging from mildly retarded children to adults who might require the type of treatment offered by TCR.

A more relevant document which was submitted by TCR to the reviewing bodies is a list provided by Catholic Charities regarding existing rates at other facilities serving individuals with behavioral problems. The average rate for those facilities in 1982 was $71.71. Again, some of those facilities serve only children. However, the list does include the following facilities, which are similar to that proposed by TCR, in that they treat mentally retarded adults with behavior problems:

    Aurora per diem rate—Aug. 1, 1980—
      $61.39

    St. Francis rate—March 11, 1982—$67.39

    Forest View rates—

      Aspen—$73.60

      Logan—$74.32

The average per diem rate for these four facilities is $69.18. The difference between the TCR proposed rate of $76.48 and the above rates is hardly significant. Moreover, as a new facility, TCR is bound to incur costs of construction and interest, as compared to "ordinary" facilities which have been in existence for many years. Perhaps, most significantly, TCR has proposed a facility for adult mentally retarded persons with behavior problems and who are also diagnosed as having mental illness.

A traditional facility will not accept as residents persons whose behavior problems require treatment on an in-patient basis. Because TCR will accept such residents, its facility will incur additional staff costs, which further accounts for TCR's higher per diem rate. In fact, TCR will have a permanent staff of professionals which other facilities do not.

TCR correctly points out that its proposed facility would reduce the number of mentally retarded residents in state hospitals. In other words, the cost of TCR's facility should actually be compared with the cost of placing residents in state mental hospitals because that is the place from which the patients will come to the TCR facility. The state hospital rate for 1982 was $102.42 (which is an operating cost figure not including depreciation or capital expenditures).

In conclusion, the cost rate of TCR is not significantly higher than a comparable facility.

### II.

The second ground asserted by the Commissioner for denial of the Certificate of Need was that there was no documentation in the record from which to conclude that TCR's plan would allow residents to be placed in a less expensive facility within 18–24 months.

Actually, the Commissioner argues that there should be documentation because the rates for TCR's facility are significantly higher than the rates of other similar facilities. Because we conclude that TCR's rates are not significantly higher, the sec-

**650**

ond ground is not important. Nonetheless, it should be noted that there is support for TCR's program from the Regional Health System Agency, Mille Lacs County Family Service, Pine County Welfare Department, Chisago County Welfare Department, Kanabec County Social Services, Isanti County Family Service & Welfare Department, ECRDC, D.D. Advisory Committee, ECED.C. Board of Directors, 5-County Mental Health Center, Chisago County Council for Exceptional Individuals, Inc., Residential Alternatives, Inc., and the Legal Advocacy for Developmentally Disabled Persons in Minnesota. All express a need for this kind of program capable of working with patients who have behavioral and mental health problems. In fact, Cambridge Hospital was particularly interested in placing some of its residents in the program. The Chisago County Developmental Achievement Center (CCDAC) stated that:

> One area, relevant to the Therapeutic Community Residence, that the CCDAC has emulated to provide services has been that of dealing with exceptional behaviors. Beginning in 1978–79, the CCDAC has developed programs, policies, trained its staff, and obtained therapeutic equipment to deal with severe behavior problems. Today the CCDAC is providing the day time programs to deal with severe behavioral problems which are effective, successful, and essential as a component to the Therapeutic Community Residence, or a facility of that nature. I would like to add that Mr. McNally and Mr. Moorman have greatly availed of themselves and their skills in the planning and development of the CCDAC's behavioral programs, and particularly Mr. McNally, played a key role in the implementation and monitoring of the CCDAC's behavior programs.

TCR's treatment model was thoroughly described in its Response to Remand by the Commissioner of Health. Although it is nearly impossible to predict with any degree of certainty the success of a new and innovative program, the need for the facility seems apparent and the professional background and experience of the directors of TCR is unchallenged. There was no evidence offered that such a program is flawed, nor incapable of accomplishing its objective of helping TCR's residents successfully return as functioning persons in their home communities.

### III.

Lastly, the Commissioner argues that there is no documentation in the record that the state hospitals do not have the capability to meet the identified need of TCR's target population or that they are not acceptable alternatives to the proposed facility. There is no documentation, for example, that the state hospitals could not also prepare the target population for movement to a more traditional facility. TCR argues that it is incredible that the Commissioner believes placement of mentally retarded persons in a state hospital is an acceptable alternative. We agree. In *Welsch v. Noot*, No. 4–72 Civil 451 (D.Minn. Sept. 15, 1980), an action in federal court was successfully prosecuted to avoid placement of mentally retarded persons in state hospitals. The *Welsch v. Noot* Consent Decree reads in part:

> Exhibit 16. Mentally retarded persons shall be admitted to state institutions only when no appropriate community placement is available. The county has responsibility for locating an appropriate community placement, or, in the event that none exists, insuring that such placement is developed. In accordance with whatever authority is granted by statute and rule the Commissioner shall assure that counties perform their duties with respect to community placements.

Moreover, the nearby Cambridge State Hospital is looking to TCR's facility to take some of its patients, and strongly supports the Certificate of Need for TCR. The agencies in the area state that the Cambridge Hospital poorly serves the population intended to be served by petitioner. Moreover, the cost of keeping mentally retarded persons in the Cambridge Hospital is greater. (The operating cost in itself is

$109.50 per diem, not including capital expenditures.)

It is difficult to understand why the Commissioner would reject an application for a Certificate of Need primarily because of the cost, and require the prospective patients to be placed in an inappropriate setting at a greater cost.

### DECISION

All evidence indicates that the appellant's request for a Certificate of Need should have been granted. The decision of the hearing examiner is reversed, and a Certificate of Need shall be issued forthwith.